ALEXANDER FERGUSON *et al.*, Appellants, *v.* ASA TALLMADGE, Appellee.

### APPEAL FROM WINNEBAGO.

A party who insists that land was bought for him in the name of another, who loaned the money at usurious rates, must connect innocent purchasers with a knowledge of such facts; and if he has been ejected from the premises without setting up such facts in his defense as a notice to others, and has abandoned the premises, declaring an intention to forego all claim thereto, he cannot have an equitable right to pursue subsequent purchasers and recover the land.

THIS bill in chancery states, that in May, 1839, a joint stock company was formed at Aberdeen, Scotland, to loan money to persons in the United States, desirous to purchase lands at the government sales, particularly in Illinois, called " The Aberdeen North American Investment and Loan Company." Its affairs were under the direction of D. Chalmers, Littlejohn, Yeates, Catto, Williamson, A. Smith, C. Chalmers, Farquahar and Foulerton, residing in Aberdeen and its vicinity.

On 10th May, 1839, these directors entered into an agreement under seal, with one William Taylor, then of Thomaston, Scotland, appointing him manager of the company's business in America, for the term of five years, and Taylor covenanted to proceed to the United States, and continue in the service of the company for five years, and to act as manager, for a salary stipulated in the agreement, and would not enter into or be concerned with any transaction whatever in business in America, in his own name or that of another, and that all investments in America which should be made in his name or another's for his behalf, should be held to be made with the funds and for the behalf of the company.

The directors furnished Taylor with a large amount of money, with which he came to Illinois, to loan the same to persons desirous of borrowing it to purchase public lands at government sales thereof, upon the security of such lands. For that purpose he attended previous to and at a land sale at Chicago, previous to the sale at Galena afterwards mentioned in the bill, and loaned a large number of thousand dollars to a great many persons, to enter lands at the sale, at the rate of thirty-three and a third per cent. interest to the year or higher, and to secure the payment of the loan and interest, had the lands bid off in his own name, and gave the purchasers thereof contracts to convey the legal title to their lands respectively upon the repayment of the loan and interest, in the same printed form as the contract between Taylor and complainant afterwards mentioned in the bill, the parcels entered lying in McHenry, Boone, De Kalb and La Salle counties.

For two or three years previous to the land sale at Galena, in the latter part of October, 1839, complainant was settled upon a tract of land in the county of Winnebago, consisting of south half of Sec. 34 and west half of Sec. 35, Town. 45 north, Range 2 east, 3rd principal meridian, containing 640 acres. He had a pre-emption right to a quarter section of it, by residence, and had improvements thereon of considerable value. The tract, including improvements, was then worth $2,000; and he held the whole tract as his claim, according to custom. He intended to acquire the legal title by purchase from the

government, for his own benefit, when it should be sold, and he held possession for that purpose.

A sale of lands, including this section, was proclaimed by the President, at Galena, about 24th October, 1839, but the proclamation was known in the vicinity only about six weeks previous to the sale.

Complainant had not means to enter the land, nor could raise the same otherwise than by loan, and from the shortness of the time and other causes, could not go East where the money could be procured.

Taylor had shortly before lent money at the sale at Chicago; and shortly after the publication of the proclamation, he gave out word that he would attend the sale at Galena, to lend money in the same manner as at Chicago; and complainant was induced to rely upon borrowing of him, and made no other provision.

Taylor accordingly attended at Galena, previous to and during the sale, for the purpose of loaning money as aforesaid, and so loaned $16,000 or thereabouts.

Complainant went to Galena shortly before the commencement of the sale, for the purpose of effecting a loan from Taylor to purchase the two half sections at the usual rate of $1.25 per acre. Complainant made application to Taylor, to lend him $800 for that purpose, to which he readily consented, and thereupon a discussion arose as to the rate of interest; whereupon Taylor stated to complainant that he loaned money to all others at the rate of thirty-three and a third per cent. or more, and that he would lend to complainant at no lower rate.

Having no other resource, complainant was obliged to comply, or lose his improvements, and the chance of entering the half sections, and was forced to and did consent to borrow the $800 at the rate of thirty-three and a third per cent. by the year, to be paid in four installments, or fifty per cent. for one year, if complainant desired to pay it in one year.

Complainant inquired what security he would require, and was informed by Taylor that he in all cases required the land to be bid off in his own name, and the receipts to be given in his own name, and held the title as security for payment, and should require the same of complainant.

It was therefore agreed that complainant should bid off the half sections in Taylor's name; that Taylor should furnish the $800 to pay for them, and that complainant should repay him with thirty-three and a third per cent. interest as follows: $264 in one year, $264 in two years, $264 in three years, and $1,064 in four years; and should covenant to convey the land to complainant on payment. It was further agreed that the payment

should be made at Chicago, and that the payment of $1,200 in one year should be taken in full satisfaction of the above sums, and of the $800 and interest. Taylor showed complainant a printed form, which he stated he required every person to execute, and should require complainant to execute.

Complainant, with the knowledge and approbation of Taylor, employed one Wade to bid off the half sections in Taylor's name, and complainant agreed to pay him one dollar for such service.

Wade, on 29th October, 1839, bid off the land in half quarter sections, in Taylor's name, at $1.25 per acre, the $800 was advanced by Taylor, the receipts were made out in his name; complainant paid Wade the dollar, and Taylor was not present at the sale.

At the conclusion of the land sale, a contract under seal was executed by Taylor and complainant in the printed form, in pursuance of the said agreement made before the lands were bid off, dated said 19th October, 1839, whereby complainant covenanted to pay the three sums of $264, and the $1,064, in one, two, three and four years, and Taylor covenanted to convey the lands to complainant upon the money and interest being paid as above mentioned.

Complainant continued in possession of the lands, and resided thereon, until November, 1846, claiming them as his property, subject only to the incumbrance of security for the loan aforesaid.

Patents were issued to Taylor; and about April, 1842, he died at New Orleans, having 4th September, 1841, made and published at New Orleans, a paper purporting to be his will, whereby he bequeathed pecuniary legacies to several relatives, payable out of his personal property; and he inserted a clause purporting to leave and bequeath the residue of his estate whatsoever to the defendant, Ferguson, of St. Louis, and James Duncan, of New Orleans, and appointed them and defendants, Farquhar, G. Porter, G. Taylor and W. Primrose, his executors.

The will was not attested by two witnesses, as required by statute of this State, nor by any witness whatsoever, so that it was insufficient to convey land or any interest therein lying in this State. The will was not admitted to probate in this State.

At Taylor's decease the first three installments only had fallen due, and no part had been paid; and after his decease there was no person in this State authorized to receive the money, nor was there any person authorized to release or convey the legal title to the land.

The directors of the loan company, on the 8th of Feb. 1845, filed in this Circuit Court their bill in equity, setting forth the

contract between them and Taylor, and that Taylor received
from them a large amount of money for investment in the United
States, with which he came to Illinois as manager; that defend-
ant Ferguson, of St. Louis, when the bill was filed, was appoint-
ed accountant; that Taylor, at divers times, entered with those
moneys divers tracts of land in Illinois, in Winnebago, Boone,
McHenry, De Kalb, Whiteside, Rock Island, La Salle, Kane and
Madison counties, specified in schedules, including the half sec-
tions purchased by complainant as aforesaid, amounting to fifty-
three half quarter sections in Winnebago, forty-five in Boone,
fifty-four in McHenry, twenty-seven in De Kalb, seventeen in
Whiteside, twelve in Rock Island, fifteen in La Salle, twenty in
Kane, and one in Madison; that Taylor, in direct violation of
the agreement, purchased and took the title to those lands in his
own name, and not in his and Ferguson's as manager and ac-
countant, as he ought to have done, and thereby Taylor became
trustee of the directors, and was bound to convey the lands as
they might appoint; that after the purchase of the tracts, Tay-
lor made several contracts in his own name for sale of portions
thereof, which were outstanding and unperformed; that about
the 4th Sept. 1841, Taylor, at New Orleans, made his will, ap-
pointing Ferguson one of said directors, George Porter, of
Aberdeen, George Taylor, of 93rd regiment British army, Wil-
liam Primrose, of Harrisburgh, Pa., Ferguson and James Dun-
can, of New Orleans, his executors; that he made several
bequests in money, specified in the said bill; and that the resi-
due of his estate, of whatever kind, he left and bequeathed to
Ferguson and Duncan, after paying debts and funeral expenses;
that he directed his executors, in six months to sell sufficient of
his personal property to pay the legacies, so as to leave Fergu-
son and Duncan in the undisturbed possession of the residue of
his estate.   A copy of the will was annexed.   That about April,
1842, Taylor died at New Orleans, leaving Isabella Taylor, his
mother, his said brother George, his sisters Ellspet Porter and
Elizabeth Primrose, his only heirs him surviving, and sufficient
personal individual estate to pay legacies, without resorting to
real estate; that the will was, on the 22nd April, 1842, admit-
ted to probate and record in New Orleans, but no letters testa-
mentary had ever been granted, nor administration had; that
after the probate, Duncan died at New Orleans, leaving heirs or
devisees unknown to the directors.   The directors insisted, that
notwithstanding the devise to Ferguson and Duncan, the lands in
equity belonged to them as directors and trustees of the com-
pany, and they had an equitable and legal right to require them
to be conveyed as they might appoint, to be disposed of for the
benefit of the company.   They made Isabella Taylor, Elizabeth

38

Primrose and William Primrose, her husband, Ellspet Porter and George Porter, her husband, Ferguson and the unknown heirs and devisees of Duncan, defendants; required them to answer without oath, and prayed that the lands might be conveyed to Ferguson.

The defendants were brought in by advertisement only, and at April term, 1845, the bill was taken as confessed, and without proofs a decree was made, declaring that Taylor purchased the lands with the moneys of the directors as such directors, and in trust for them; that said persons named as his heirs were his heirs; that the real estate of Taylor was devised to Duncan and Ferguson; that the heirs of Duncan were unknown; that a conveyance of all the interest the defendants might have in any of the tracts ought to be made by them to Ferguson, in trust for the directors; that the trust in Taylor and his representatives for said directors, be established; that what Ferguson had by the devise be held by him in trust for the directors, for their exclusive benefit; and that defendants should, by 24th of April, release to Ferguson.

No release was made. James M. Wight was appointed commissioner, and in May, 1845, executed a deed in conformity to the decree, which was confirmed 19th of August, 1845.

Under color of that conveyance, Ferguson ousted defendant Tallmadge in November, 1846.

In 1848, Ferguson negotiated with defendant Robert Smith for the east half of the south-west quarter, and the east half of the north-east quarter of Sec. 35, Town. 45, north, Range 2 east of the third principal meridian, containing 160 acres.

About the same time Ferguson also made some agreement with defendant Montgomery for the west half of the south-east quarter of Sec. 34, and the north half of the east half of same quarter section, under which Montgomery went into possession.

On the 22nd November, 1849, Ferguson deeded to defendant Kirk, with general warranty, for a consideration expressed to be $320, the west half of the south-west quarter of Sec. 35.

About January, 1849, defendant Ralston negotiated with Ferguson for the south-west quarter of Sec. 34, and the west half of the north-west quarter of Sec. 35, and went into possession of those tracts, and has occupied them ever since, but complainant is not aware what agreement was made.

Within a year, or thereabouts, before filing of bill, defendant Dennis negotiated with Ferguson for the purchase of the south-east quarter of the south-east quarter of Sec. 34. Complainant is not aware what contract was made, and the land has been unoccupied.

Ferguson et al. *v.* Tallmadge.

Complainant avers and insists that it is not true, as alleged by the directors in their bill, and declared by the decree, that the two half sections described were entered and purchased with the moneys of the said company, or in trust for them; but complainant entered and purchased them for his own benefit, and they were paid for with his moneys, loaned of Taylor, and not with moneys of the directors; complainant had them bid off in Taylor's name to secure repayment.

The other tracts were in like manner purchased by divers persons, and paid for with moneys borrowed by them of Taylor; and complainant avers, that the allegations in the said bill, that the said lands were purchased with the moneys of the company, and in trust. for them, are not only untrue, but false and fraudulent.

It is not true, as declared in the decree, that the real estate of Taylor was devised to Ferguson and Duncan; and he insists that the alleged will is palpably insufficient to convey real estate in Illinois, so that the said lands descended to the heirs of Taylor; and the complainant insists that the said allegation was fraudulently obtained to be inserted in the decree.

The alleged contracts with Taylor were none other than the contracts of complainant and others with Taylor, to secure to him repayment of moneys borrowed, with exorbitant rates of interest, and all of them were mortgage securities.

The bill, decree, and proceedings under it, were fraudulently set on foot by the said directors, unjustly and unlawfully to get the legal title to the tracts vested in a trustee in their behalf, so as to defeat the resulting trust and equity of redemption which the said purchasers had in the same, and to defraud complainant and the rest of them of their purchases. And complainant insists that the right of Taylor being only a mortgage interest, and the contract for the payment of the mortgage moneys not being assigned to the directors, the supposed conveyance of the legal title under the decree was nugatory and conveyed no right whatever, if it were otherwise legal.

It appears by said bill, and is true, that there was no executor or administrator of Taylor, or other person who could receive payment of the contracts with Taylor, or release them, so that if the transfer to Ferguson should stand, complainant is still liable to any executor or administrator of Taylor who may appear, without means of obtaining title, and the other said purchasers are in the same predicament.

If Taylor were the agent and trustee for the directors, and they were entitled to the proceeds of his operations, the only lawful and honest mode to avail themselves was to cause some person to administer in this State, collect the moneys due for the

loans, and to procure the heirs or devisees of Taylor to convey title, and to cause the administrator to account to them. The reason why they did not, and why they filed their bill was, they intended, by getting the legal title into a trustee for themselves, to defraud the complainant and the other purchasers of their equity of redemption, and, under color of having the legal title, to extort large and exorbitant sums not due, to get title, or if the purchasers refused or were unable to pay.

In pursuance of this plan, Ferguson, in September, 1845, demanded of complainant $2,385.60, for a conveyance of the two half sections, and upon complainant refusing, proceeded to oust him, and offered to sell to others.

The bill and decree were fraudulent in this, that the last installment in complainant's contract was not due at Taylor's decease, and he had not an opportunity to make payment to any representative of Taylor ; and the other purchasers were in the same predicament.

Ever since the time for payment of the last installment, complainant has been willing and desirous to pay the $800, with legal interest, and get title, and he is now ready and willing, and offers to do it, and to pay any sum the court may decree.

Complainant was not a party to the bill of directors, nor were other purchasers, and he had no opportunity to defend his rights or prevent the decree, nor had the other purchasers, although according to rule, he and they were indispensable parties. The omission was fraudulent, and complainant insists that the decree was void as to him.

The defendants to complainant's bill, especially Robert Smith, Montgomery, Kirk, Ralston and Dennis, at all times since the entry of the half sections, had notice of the rights and claims of complainant, and of his possession of and residence upon the same under such claim.

On the 17th of June, 1850, Ferguson executed a deed of the half sections, except the quarter quarter section he had deeded to Kirk, with divers other tracts mentioned in the decree, purporting, in consideration of $1, to release them to defendant William Primrose, of St. Louis, with special warranty.

Charge that the contract was fixed to conceal usury, and give the contract the appearance of a sale and purchase.

By reason of the Sutphen suit, the directors and their agents becoming alarmed lest others might avail themselves of their equity of redemption, on the 8th of February, 1845, after proofs taken as aforesaid, filed their aforesaid bill in the Circuit Court of Winnebago county, and fraudulently omitted to make complainant and other purchasers parties, for the purpose of anticipating and forestalling them, and of defrauding and depriving

them of their equities of redemption, before they should be aware of the result or pendency of the Sutphen case, and thus prevent their redemption, and the directors obtained a decree by collusion with Ferguson and other defendants, to their bill.

Complainant's bill required defendants to answer under oath, in the usual form, and interrogates as to contracts of Smith, Montgomery, Ralston, Kirk and Dennis with Ferguson, and the payments made upon them ; about claim, residence and possession of complainant, and the time when the defendants knew thereof; about their knowledge of Taylor's transactions and contract with complainant; whether, at the time of contracts, it was not a subject of common conversation in the neighborhood, that the complainant had entered the half sections as stated; and intended to insist on his right; whether they were not called " The Tallmadge lands," and whether Ralston did not come into the neighborhood of the lands and inquire into the title, and had not been told of complainant's possession and claims.

That said decree as to complainant and the half sections may be decreed fraudulent, null and inapplicable ; that the conveyance of the half sections under it may be set aside, that complainant's equity of redemption may be declared, and account taken ; a day be assigned for paying principal and interest into court for the use of the persons entitled to it, to be paid out when right to it is established ; that Taylor's heirs, etc., and Ferguson and Primrose release and convey ; and that possession be given ; and for general relief.

The answer of Thomas Primrose admits the existence of a company in Scotland with directors, as stated in the bill, and that the business of the company was to invest their capital in property and securities, real or personal, in the United States, and that they contracted with William Taylor, as stated in the bill.

Said Taylor proceeded to the United States, located at the city of St. Louis, and carried on business for said company, and among other things, he made large investments of money in the purchase of lands in Illinois ; attended the land sales at Galena, and there purchased large tracts of land, taking the title in his own name. That after the purchase, said Taylor made contracts with persons to sell them the lands purchased by him at said sales, but did not make loans to any person at that time.

Defendant denies having any knowledge or information of complainant ever having resided on the lands in question, or of having any dealings with William Taylor.

Admits that Taylor purchased the lands in controversy at the public land sale, and gave the contract set out in the bill, to complainant, but denies any loan having been made.

April 20th, 1846, a judgment was rendered in the Winnebago Circuit Court in favor of said Ferguson against said complainant in an action of ejectment, in consequence of which complainant abandoned said premises about November, 1846. Denies that complainant did the ordinary acts of ownership, such as cultivating, improving, etc.

Admits that Wm. Taylor died in March or April, 1842, having made a will as stated in the bill.

When Taylor died there were two installments due and unpaid on complainant's contract; from that time until the title of the lands became vested in said Ferguson, complainant might have paid either to Alexander Brand in Chicago, or to said Ferguson in St. Louis, who were authorized to receive the money due on said contract. Said complainant had not paid the taxes accruing on said land while he resided on it.

Admits the proceedings in chancery, decree, and conveyance to said Ferguson as stated in the bill, but that testimony was taken in the suit, and the proceedings were all in good faith, without fraud, and that complainant remained in possession of the land a long time after he had forfeited all right to the same by his contract.

Said Ferguson made a written contract with defendant Montgomery, dated June 26, 1848, to sell to him the west half of the south-east quarter of said Sec. 34, for the price of $480, payable $150 Nov. 1, thereafter; $165 Nov. 1, 1849, and $165 Nov. 1, 1850, with interest and the taxes; that said Montgomery paid all of the said purchase money prior to the commencement of this suit, except $114.63 which was paid Aug. 28, 1851, when a deed was executed to said Montgomery by this defendant, in whom the title then was. Montgomery had had possession of and had cultivated and made improvements and paid the taxes on said land since the date of his contract.

Said Ferguson made a similar contract with William Ralston, April 27, 1849, to convey to him the south-west quarter of Sec. 34, and the west half of the north-west quarter of Sec. 35, for $960, payable $320 down, $320 in one year, and $320 in two years, with interest and the taxes; that said Ralston at that time paid the $320, took possession of the land—paid afterwards, and before this suit was commenced, $358.40; May 5, 1851, he paid the balance, and Aug. 28, 1851, took his deed from defendant. He made a similar contract with defendant Kirk, Nov. 26, 1847.

June 27, 1849, Ferguson contracted to convey to Jas. E. Dennis the south-east quarter of the south-east quarter of Sec. 34, for $200; $50 was paid down, the balance payable, $75 in one year, and $75 in two years, with interest and taxes. Dennis

paid before the commencement of suit $114, and since $102.50, together with the taxes—has had possession since the date of his contract, and received his deed from defendant.

Defendant was not advised of the suit or proceedings in chancery until after the termination, but denies all fraud, and insists upon their legal effect to vest the title of the lands in the trustee appointed by the decree.

Complainant never paid or offered to pay the amount specified in the contract of sale of said Taylor, and after Ferguson became vested with the title, he brought a suit in ejectment against complainant, and obtained judgment, and complainant abandoned the premises, never having paid or offered to pay anything, even the taxes thereon. Soon after, Ferguson advertised the lands for sale until the lands were sold, and complainant took no steps to prevent a sale, or to assert his claims.

Ferguson conveyed the lands to defendant in good faith, and he never had any notice of complainant's claim until the commencement of this suit.

Defendant claims the benefit of the act entitled "An Act concerning conveyances of real estate," passed January 31, 1827, also an act of Congress entitled "An Act for the relief of purchasers of public lands," etc., passed March 31, 1830. Also that more than six years have elapsed since the making of the contract, before the bringing of this suit.

By the terms of the contract, Taylor or his grantees had the right to declare it forfeited, and Ferguson had so declared it long before the sale to said defendants.

The answer of William Ralston denies any knowledge of complainant's residence on the land in dispute, or of his desire or purpose to purchase it. Admits that it was originally entered by Wm. Taylor; that said Taylor died, and proceedings in chancery were had in behalf of David Chalmers et al. vs. Alexander Ferguson et al., to vest the title of the land in said Ferguson. On the 27th day of April, 1849, defendant purchased the land in question of Alexander Ferguson and Thos. Primrose for the sum of $960: paying for it $320 May 21st, 1849, and agreeing to pay $640 in two annual payments, with interest and taxes; said Primrose executing to him an agreement in writing to convey the land on payment of said amount. On the 26th day of May, 1850, defendant paid to Ferguson on the contract, $358.40, and May 5th, 1851, he paid the balance, $339.73, to Primrose, the grantee of Ferguson, and received from him a warrantee deed, dated August 28th, 1851.

Defendant entered into possession of the land about May 20th, 1849, and before he had any intimation of complainant's claim he had paid for purchase money $698.40, and for permanent im-

provements $320 ; and since service of the summons in this suit, $220 for improvements, and $22.02 for taxes.

Denies all knowledge of fraud in the chancery suit, and insists that it was instituted rightfully for the purpose of determining the title of the land, and defendant claims the benefit of the same as constituting a part of his chain of title.

Denies any knowledge of complainant having any claim to the land until the service of the summons and until defendant had paid out $998.40 ; at the time of the purchase the land was unoccupied and unimproved ; defendant, before purchasing, carefully examined the public records of the county of Winnebago, which showed the title in said Ferguson, and there was no indication on record of complainant or any other person having any conflicting title or interest. Defendant claims the benefit of the statute entitled " An Act concerning conveyances of real property," approved January 31st, 1847, complainant not having had his contract with Taylor recorded within thirty days, nor before defendant's purchase.

Defendant also claims the benefit of the act of Congress entitled " An Act for the relief of purchasers of public lands," etc., passed March 31st, 1830. Defendant claims the benefit of the lapse of more than six years—Ferguson had declared the contract forfeited.

The answer of James E. Dennis admits that complainant some time resided on some part of the tract of land mentioned in the bill, but denies all knowledge of the existence, nature or extent of complainant's claim, or of his dealings with William Taylor.

June 27th, 1849, defendant bought of Alexander Ferguson the land in question for $200, paying down $50, and taking from him contract for a deed on the payment of the balance, with interest in two equal annual payments, together with the taxes.

Previous to the commencement of this suit defendant had taken possession of the land and had paid to Ferguson $114 of the purchase money, and afterwards he paid the balance, $102.50, to Thomas Primrose the grantee of Ferguson, and received from him a warrantee deed of it, dated April 22, 1851.

There was no improvement on the tract purchased by defendant ; complainant had abandoned his residence in the neighborhood—the whole tract of land had been advertised for sale a considerable time before defendant's purchase.

In all other respects same as the answer of William Ralston.

The answer of James Montgomery states the purchase of the land being made by him June 24, 1848, and that he paid Nov. 18, 1848, $150 ; Nov. 21, 1848, $60 ; Oct. 2, 1850, $100 ; Nov. 1, 1850, $100 ; and the balance $114.63, Aug., 1851, and

received his deed. In other respects mainly the same as the answer of Ralston.

The answer of defendant Kirk shows that he purchased his land of Ferguson Nov. 22, 1848, and paid for it $320, and took his deed Nov. 2, 1849.

He built a house and made other permanent improvements on the land, to the amount of about $1,000. Previous to making the purchase, defendant had examined the records of the county and found no appearance of title in other person than Ferguson; and complainant had abandoned the land, and told defendant that he had abandoned his claim to it.

He admits the conveyance from Wight to Ferguson, and insists that the chancery proceedings were valid and cannot be impeached.

In other respects same as answer of Ralston.

Deposition of *Samuel Cook.* Witness is acquainted with the lands in question, and has been a good many years, and was as early as the winter of 1836 or 1837.

Should think there was some breaking done on the south-east quarter of south-west quarter Sec. 35, in the fall of 1836 or 1837. In 1837 or 1838, he broke some prairie on east half of south-east quarter Sec. 34, for Tallmadge. There was some fencing on the piece last described. There was a house on the west half of north-west quarter Sec. 35, previous to land sale in 1839.

Before the land sale, Tallmadge told me he claimed the two half sections, and I supposed he did, as no other person claimed to hold them. I claimed the whole or a greater part of the half sections, and sold it to Mr. Spoors for 1,000 rails in 1836 or 1837. Afterwards in 1836 or 1837, Mr. Spoors came to me with Tallmadge, and said if I would take him (Tallmadge) for the rails, he would give up the trade to him. I told him I would. Tallmadge furnished me the rails, and I considered the claim his. Tallmadge took possession in 1836 or 1837, built a house and put on the fencing before referred to, and lived on the premises with his family up to and for a number of years after the land sale. He commenced living on the land in the latter part of the year 1836 or 1837. (Answer objected to.)

The sale commenced in October, 1839. The notice was very short. Witness attended, and saw Taylor. He said to witness and to other settlers, he would enter their lands provided they would have them bid off in his name, and he would give a bond to deed after a certain number of years, in case they would pay him according to the stipulations in the bond. The rates as he gave them to me and some others, were that we should pay him $33 per year for each eighty, and at the end of the term $133. Taylor said to me and other settlers, that he would furnish us

the money to enter our lands for 33 per cent., if we would get the land entered in his name, and he would give us a bond for a deed. Taylor made such a contract with me and others in my presence. Was not present when Tallmadge's contract was made.

Witness has known defendant Robert Smith about ten years; Montgomery ten, Kirk twelve or fourteen, Ralston three, and Dennis eight or ten. They have all of them resided, except Ralston, in the neighborhood of the lands above referred to, since he became acquainted with them. Ralston has lived most of the time since I knew him on the premises above described.

It appeared in proof that there were two fields broke and fenced, and a house on the land in 1838. Tallmadge was living with his family in the house in 1838 or 1839. Both half sections, so far as he knew, were called one claim, and were called the Tallmadge claim.

That Robert Smith, Montgomery, Dennis and Kirk have resided in the immediate neighborhood of the Tallmadge lands. Kirk said he had bought eighty acres of the Tallmadge land, and had built a good house on it, and if Tallmadge got the land he would get a good house. The lands have always been called the Tallmadge lands.

*John Dyer* testified, that the two half sections were considered as one claim, and Asa Tallmadge was in possession of it, and claimed the same. He lived on the claim with his family as early as 1837, and had possession and lived on the premises up to and after the land sale.

That the loan to Tallmadge was to enter the land in question.

That Tallmadge resided on the lands after the land sale over three years.

That defendants Robert Smith, Montgomery, Kirk and Dennis have all of them, except Ralston, resided in the immediate neighborhood of the Tallmadge lands. Ralston lived about three miles from these lands previous to and up to the time he moved on the Tallmadge land, where he now resides.

One witness stated that he had some conversation with defendants Kirk, Ralston, Smith and Mongomery about Tallmadge's claim to the lands. Ralston said Tallmadge had forfeited his bond, and he did not think he could hold the land. He said Tallmadge had never paid any thing on the land, and had forfeited it, and he did not think he could hold it. The duplicate had been taken in Taylor's name, and he could hold it. Don't recollect what was said with Montgomery. Kirk seemed to carry the idea that Tallmadge stood a good chance to get the land back.

That when Tallmadge first went to Taylor, he said he wanted to hire money to enter the lands in question, and asked what terms he would enter it on, and what interest he asked. Tay-

lor said he should want thirty-three and one-third per cent. per annum for three years ; said he would take the duplicate in his own name, and give him a bond for a deed. Tallmadge objected to giving so high a rate of interest, and tried to beat him down. Taylor said that was his rate, and would not let it go for a less rate ; that he had the lands bid off in his own name, and gave bonds for deeds.

That the contract of sale from Taylor to complainant, was dated October 29, 1839.

Deposition of *Robert Montgomery.* James Montgomery resides about one mile from the Tallmadge land, and has lived there six or seven years. He is my father. Witness has lived with him since he resided there ; Tallmadge had not left the lands when his father came into the neighborhood ; and his father knew that Tallmadge lived on the land when he first came ; don't recollect working on these lands, unless in the garden ; his father got timber from the grove on the Tallmadge land, to build a house ; don't know of whom it was purchased. Is acquainted with defendant Ralston ; he was in the neighborhood but a few weeks before he purchased a part of the Tallmadge lands.

Deposition of *James Ralston.* William Ralston (defendant) is witness' father ; he has resided on what is called the Taylor lands, about three years—the lands sometimes called the Tallmadge lands ; he went there from about half a mile this side of Roscoe, in this county ; he went to examine the lands before he purchased ; thinks one or two days ; Robert Smith, and John Smith, brother to Robert, went with him to show him the land. Defendant Ralston lived in Hamilton county, Ohio, before he moved to near Roscoe ; left there four years ago last March, and had lived there about ten years.

*George Pratt* testified that he had been present at several times, at conversations between complainant and defendant Kirk ; heard one at Kirk's house, in fall of 1851 ; heard them talk about this suit ; heard each one say that they would not disturb each other about the property ; that they should have no difficulty about the property ; Kirk said he would not do anything to prevent complainant from getting the property, if complainant would not disturb him ; Kirk said complainant ought to have some of the land or some pay ; complainant said Kirk would not have any trouble from him, from the fact that he had told him to buy the land before he bought it ; don't recollect what was said about future prosecution of the suit. Tallmadge said he would not disturb Smith ; I think he said he would settle *with him ;* he said Smith and Kirk were fine people, and he would not disturb them.

There is a stipulation of the parties attached to the record, that the bill of Tallmadge correctly sets out the original bill filed by said company; also the will of said Taylor; the deed from James M. Wight, commissioner, to said Ferguson, and the deed from Ferguson to said Primrose, and that the same were in evidence in the Circuit Court, as set out.

*William Magoon* testified that defendant Kirk was in possession of one eighty of the south half of Sec. 34 and west half of Sec. 35, Town. 45, Range 2. Montgomery of one eighty and forty, Dennis of one forty, and Ralston of some part. Complainant was in possession of the lands at the time of land sale. Mr. Tallmadge rode up with me from Rockford, to Mr. Kirk's house, and on the way we got into conversation about the land Kirk had bought, and at that time Tallmadge said to me that Kirk had told him he wanted to purchase that piece of land, and he said to him to go ahead and get it if he wanted it; this conversation was a year ago this fall.

*Thomas Lake* testified, complainant lived on some part of said land previous to the land sale in 1839; can't say when he left there; it was before Kirk took possession; understood he removed to the Kishwaukee, sixteen or eighteen miles distant; same lands are now occupied by Kirk, Michael, Ralston and Montgomery; the improvements on the lands at the time complainant left, consisted of a field that had been fenced, but the fence had been removed, and a house that he had lived in, of no value. Kirk has made improvements, worth $600 or $700; two-thirds broke, and a good frame house on it; enclosing and improving the land worth $200 to $300; these improvements have been made about three years. Ralston has built a house and enclosed a large field, about three years since; improvements worth $400 or $500. The house built by Kirk was a frame house worth about $300; the fence was worth $175, and the breaking $125; the estimate of Ralston's improvements was for his fencing and breaking.

*Samuel Hovie* testified that defendants Ralston, Kirk, Montgomery, Smith and Michael had occupied the lands for four or five years; complainant left them in 1846; were no improvements on the land when complainant left; witness estimates the improvements made by the defendants, about the same as the last witness; complainant took rails from that land; Tallmadge told witness once before he left the land, that Mr. Kirk had said to him, Tallmadge, that if he did not want to buy that land, he, Kirk, wanted to buy an eighty of it, and as near as I recollect, Mr. Tallmadge said he told him he might.

*Wm. T. Kirk* testified that he lived on the farm adjoining complainant, in DeKalb county; complainant had lived there

six or seven years last fall, and came there from his former place in Winnebago county; he was intimate with witness, and conversed freely about his affairs; he said he had once given up all hope of getting the land, but now was going to try for it; he had struck a new lead; this was about four years ago; he said Kirk was on the land and was improving it.   Complainant was in the habit of visiting the lands frequently about five years since; he advised me to buy the quarter north of Kirk; about five years ago, witness said to complainant that Elisha Kirk wanted to buy the lot north of him; I do not recollect the precise answer he gave, but he said Elisha had better go and buy it, or something to that effect; he once said that there was an understanding between him and Elisha Kirk, that he should never disturb him.

*Jason Marsh* testified that he was attorney for Ferguson, in an ejectment suit against complainant; after judgment was rendered, complainant came to him and wished him not to issue a writ to get possession, for a certain time, and then he would leave voluntarily, to which witness consented.

*Robert Smith* testified that complainant told him that he was going to leave the land and go on to a claim he had on the Kishwaukee, and that witness might and had better buy it, if he wished to buy land; this conversation was in the spring of 1846, and he communicated it to the defendant Montgomery, before he purchased; also to defendant Kirk, soon after complainant told him, but he does not recollect whether it was before or after Kirk bought.   Witness went over the land with defendant Ralston, before he purchased, and told him that Ferguson had the sale of it; Ralston was in the country about ten days before he purchased; there was no improvement on that part.

*John Smith* testified that he had known the land about eleven years; in the spring of 1846, complainant and defendant Smith, were walking over the land, and complainant told him if he was going to buy land, to go on and buy some of this, for he, complainant, did not intend to have anything more to do with it; complainant was then residing on the land; he remained there about six months afterwards; defendant Kirk went on to the land in 1846 or 1847; complainant moved to DeKalb county, and was in the habit of coming back into the neighborhood of the land for several years; he knew of the land being occupied and cultivated.

By the first decree it was ordered that the bill be dismissed as to defendants Kirk and Smith.   That complainant be allowed to redeem the lands as against defendants Montgomery, Ralson and Dennis, by paying to them the moneys paid by them

before the filing of the bill, to Ferguson or Primrose, and for taxes paid by them, and the value of permanent improvements made by them before that time, charging them with the rent of the premises, and that it be referred to the master to take proofs and state an account.

It was finally decreed that defendant Ralston pay to complainant $396.70 ; being the amount for rents over and above the purchase money paid by Ralston, and that execution be issued for that sum May 1, 1858 ; that said Ralston convey said lands to complainant and give possession to him by said 1st May, or that a commissioner be appointed by the court to make the conveyance ; that the defendant Dennis convey said land to complainant in the same manner ; that defendant Montgomery make conveyance of his said land by the same time and manner, on condition of the said complainant paying him the said sum of $219.10 and interest by the said 1st May, and in case of default of complainant to make such payment, then he to be foreclosed of all equity of redemption in said premises ; and that the complainant recover his costs against said defendants Ferguson and Primrose, and one-third of his costs against said defendants Ralston, Montgomery and Dennis severally. If Montgomery, Ralston and Dennis take appeal, complainant to have thirty days after it is disposed of, to pay balance to him.

From this decree there was an appeal by defendants Ralston, Montgomery and Dennis. Stipulation for the same record to be used by appellants and plaintiffs in error.

Errors assigned on the record by appellants are as follows :

In not requiring the complainant to bring the moneys into court, and in not dismissing the bill.

In not allowing the defendants' exceptions to the bill.

In allowing to complainant rents and profits on improvements made on said lands by defendants.

In rendering a decree for said lands to be conveyed to complainant, without requiring him to pay any purchase money.

In rendering a decree in favor of complainant against defendants Ralston, Montgomery and Dennis.

In rendering a decree for costs against defendants Ferguson, Primrose, Ralston, Montgomery and Dennis.

In not rendering a final decree in favor of defendants.

In not rendering a final decree in respect to the rights of defendants Ralston, Montgomery and Dennis, as against defendants Ferguson and Primrose.

Jason Marsh, for Appellants Ralston, Montgomery and Dennis.
James M. Wight, for Appellants Ferguson and Primrose.

Francis Burnap, for Appellee.

Ferguson et al. *v.* Tallmadge.

CATON, C. J. Admitting that the original arrangement between Tallmadge and Taylor amounted to a loan of money, and that the title was made to Taylor in trust for Tallmadge, and to secure the money loaned, and it does not advance the case for the complainant in the least, till he brings home notice of those facts to the subsequent purchasers. The papers, on their face, show simply an entry by Taylor of the land at the land office, and afterwards, an agreement to sell the land to Tallmadge, on a credit of one, two, three and four years, making time of the essence of the contract. After the expiration of the term of credit, the payments not having been made, the parties holding the title of Taylor, brought ejectment against Tallmadge, and recovered of him the possession of the premises. After this, the present owners purchased the premises, paid the purchase money, took conveyances and possession, and made improvements, long before this bill was filed. It is unnecessary to examine whether the defendants purchased with a knowledge of the original contract of sale from Taylor to Tallmadge, for there is not in the whole of this record any fair pretense for saying that they had any notice of the secret parole understanding which would change it from an agreement to sell, into a security for a loan. If they were chargeable with notice of any thing, it was with the rights of the parties as they appeared on the face of the papers. If they knew that Tallmadge had a contract for the purchase of the land from Taylor, they also knew that he had forfeited all rights under that contract by not complying with its terms, and had even been ejected from the premises. If he had any equities, by which he was entitled to enforce a conveyance of the land, not apparent on the face of the papers, it was due to third persons that he should have interposed these equities in a proper mode at the time he was sued in ejectment. When he let judgment go against him in that action, without a pretense of either a legal or an equitable claim to the land, and without even a struggle,—when he afterwards abandoned the possession, and tore down the house, and carried off the fences, and left it without improvements,—when he proclaimed publicly that he intended to have no more to do with the land, and advised others to purchase of Ferguson and Primrose,—the subsequent purchasers certainly had a right to suppose that they were getting a title divested of any claim which he might have had to the premises.

The decree in this case will have to be reversed and the bill dismissed.

*Decree reversed.*